**Edward H. Trompke**, OSB #843653
ed.trompke@jordanramis.com
**Joseph A. Rohner IV**, OSB #064919
joseph.rohner@jordanramis.com
**Christopher K. Dolan**, OSB #922821
chris.dolan@jordanramis.com
JORDAN RAMIS PC
Two Centerpointe Dr., 6th Floor
Lake Oswego, Oregon 97035
Telephone: (503) 598-7070
Facsimile: (503) 598-7373

Attorneys for Plaintiffs Oregon Restaurant and Lodging Association and Restaurant Law Center

**Angelo I. Amador** (*Pro Hac Vice* Admission Pending)
aamador@restaurant.org
RESTAURANT LAW CENTER
2055 L Street, NW, Suite 700
Washington, DC 20036
Telephone: (202) 492-5037
Facsimile: (202) 331-2429

Attorney for Plaintiff Restaurant Law Center

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

OREGON RESTAURANT AND LODGING ASSOCIATION, an Oregon Domestic Non-Profit Corporation; and RESTAURANT LAW CENTER,

Plaintiffs,

v.

KATE BROWN, in her official capacity as the Governor of the State of Oregon,

Defendant.

Case No. 3:20-cv-2017

PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER

EXPEDITED CONSIDERATION REQUESTED

REQUEST FOR ORAL ARGUMENT

## LOCAL RULE 7.1 CERTIFICATION

Pursuant to L.R. 7-1(a)(1), conferral on this motion with defendant is not required.

## RULE 65 - EFFORT TO PROVIDE NOTICE

The undersigned attorney Edward Trompke certifies that on November 20, 2020, he attempted to notify both plaintiff's General Counsel and the Oregon Attorney General that plaintiffs were filing the above-entitled proceeding, and that plaintiffs would be seeking issuance of a temporary restraining order enjoining Executive Order 20-65. Voicemails were left indicating these intentions with both General Counsel and the Attorney General, together with Mr. Trompke's contact information. An assistant at the Attorney General's office called back and asked that all contact go through the Trial Division of DOJ. Upon calling the Trial Division, Mr. Trompke was not connected to an attorney, but was asked to email the pleadings to an individual in the Trial Division when they are complete. As of the filing of this motion, neither counsel has contacted the undersigned counsel.

## MOTION

Pursuant to Fed. R. Civ P. 65, plaintiffs move for issuance of a temporary restraining order, together with an order requiring defendant to show cause why a preliminary injunction should not be issued. This motion is supported by the Declarations of Chad West ("West Dec."), Jason Brandt ("Brandt Dec."), Dani Rosendahl ("Rosendahl Dec."), and Dean Griffith ("Griffith Dec."), the records and files herein, and the points and authorities which follow.

## POINTS AND AUTHORITIES

### Factual Background

On Tuesday, November 17, 2020, Oregon Governor Kate Brown, defendant, acting in her official capacity, issued Executive Order 20-65 entitled "Temporary Freeze to Address Surge in

COVID-19 Case in Oregon" ("EO 20-65."), a copy of which Plaintiffs attach with this Motion.[1] EO 20-65 took effect less than 24 hours later on Wednesday, November 18, 2020, and it will remain in effect through Wednesday, December 2, 2020, "unless extended or terminated earlier by the Governor."[2] *Id.*

Specific to these plaintiffs, EO 20-65 provides in pertinent part:

> **4.** **<u>Business and sector-specific restrictions during the freeze period.</u>** Pursuant to ORS 401.168(1), ORS 401.188(1) to (3), and ORS 433.441(3)(a), (b), and (f), business must comply with any applicable OHA guidance, including but not limited to employer guidance, and face coverings guidance, which may be amended from time to time. Additionally, the following requirements apply:
>
> **a.** **Food and drink establishments:**
>
> (1) During the freeze period, restaurants, bars, taverns, brew pubs, wine bars, wineries, cafes, food courts, coffee shops, clubs, or other similar establishments that offer food or drink may not offer or allow on-premises consumption of food or drink, inside or outside. Establishments may offer food or drink for off-premises consumption (e.g. take-out or drive through (or for delivery).
>
> (2) Paragraph 4(a) of this Executive Order does not apply to health care facilities, child care facilities, workplaces, government buildings, emergency response activities, school-based food programs, encampments of people experiencing homelessness, and shelter and mal programs serving vulnerable populations. Such places are encouraged to use physical distancing, staggered schedules, take-out, and other similar measures to reduce the risk associated with the spread of

---

[1] Also available at https://www.oregon.gov/gov/Documents/executive_orders/eo_20-65.pdf (visited November 19, 2020).

[2] This period of time is identified in EO 20-65 as a "freeze period."

> COVID-19, and must follow any applicable OHA guidance.

*Id.* EO 20-65, however, also provides that certain "sectors of Oregon's economy may continue to operate during the freeze period(.)" *Id.* Specifically, EO 20-65 provides:

> **4. <u>Business and sector-specific restrictions during the freeze period.</u>**
>
> * * *
>
> c. **Certain sectors subject to OHA guidance during freeze period.** * * * Activities and business subject to this requirement ***including, but are not limited to*****:**
>
> (1) Grocery stores and pharmacies may continue to operate, but are limited to 75% capacity;
>
> (2) Retail, farmer's markets, indoor and outdoor malls, and state agency operations that serve the public may continue to operate, but are limited to 75% capacity.
>
> (3) Personal services, as defined in OHA guidance;
>
> (4) Outdoor recreation and outdoor sports, including Division I college sports;
>
> (5) Drive-ins;
>
> (6) Transit, youth programs, self-service operations, and such other sectors for which OHA issues freeze period guidance.

*Id.* (Emphasis added.) Finally, as pertinent here, EO 20-65 provides an enforcement mechanism, which includes "civil penalties" up to a "maximum fine of $500 per day per violation(,)" and for any person "knowingly violating" EO 20-65, "upon conviction thereof, be guilty of a Class C misdemeanor, which is punishable by 30 days in jail or a fine of $1,250 or both." *Id.*

/ / /

**Standard for Issuance of a Temporary Restraining Order**

In order to obtain a temporary restraining order ("TRO"), plaintiffs must demonstrate (1) they are likely to succeed on the merits, (2) that they are likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities weighs in plaintiffs' favor, and (4) it is in the public's best interest that a TRO (and preliminary injunction) be issued. *Winter v. Natural Res. Def. Council*, 129 S.Ct. 365, 374 (2008). When the government is a party, the last two factors of the injunction analysis merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014); *Index Newspapers LLC v. City of Portland*, -- F.Supp. 3d --, 2020 WL 4883017, at *26 (D. Or., Aug. 20, 2020, Simon, J.).

Further addressing this standard, the Ninth Circuit, in *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-35 (9th Cir. 2011), stated:

> The majority opinion in *Winter* did not, however, explicitly discuss the continuing validity of the "sliding scale" approach to preliminary injunctions employed by this circuit and others. Under this approach, the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another. For example, a stronger showing of irreparable harm to plaintiff might offset a lesser showing of likelihood of success on the merits. * * * This circuit has adopted and applied a version of the sliding scale approach under which a preliminary injunction could issue where the likelihood of success is such that "serious questions going to the merits were raised and the balance of hardships tips sharply in [plaintiff's] favor." * * * That test was described in this circuit as one alternative on a continuum. * * * The test at issue here has often been referred to as the "serious questions" test.
>
> * * *
>
> For the reasons identified by our sister circuits and our district courts, we join the Seventh and the Second Circuits in concluding that the "serious questions" version of the sliding scale test for preliminary injunctions remains viable after the Supreme Court's decision in *Winter*. In this circuit, the test has been formulated as follows:

> A preliminary injunction is appropriate when a plaintiff demonstrates ... that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor.
>
> * * * Of course, plaintiffs must also satisfy the other *Winter* factors.

(Citations omitted.)

**1. Plaintiffs are likely to succeed on the merits.**

"There is some uncertainty as to the exact degree of likely success that stay petitioners must show, due principally to the fact that courts routinely use different formulations to describe this element of the stay test." *Leiva-Perez v. Holder*, 640 F.3d 962, 966 (9th Cir. 2011). The *Leiva-Perez* Court added:

> There are many ways to articulate the minimum quantum of likely success necessary to justify a stay—be it a "reasonable probability" or "fair prospect," * * *; "a substantial case on the merits," * ** or, * * * that "serious legal questions are raised." We think these formulations are essentially interchangeable, and that none of them demand a showing that success is more likely than not. Regardless of how one expresses the requirement, the idea is that in order to justify a stay, a petitioner must show, at a minimum, that she has a substantial case for relief on the merits.

*Id.* at 967-68. (Citations omitted.)

**a. Equal Protection and Due Process.**

> All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. Const., amend XIV, art. I.

**"**The purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the state's jurisdiction against intentional and arbitrary discrimination,

whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." *Sunday Lake Iron Co. v. Wakefield to.*, 247 U.S. 350, 352 (1918). The U.S. Constitution requires, "essentially * * * that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Center*, 473 U.S. 432, 439 (1985), *superseded by statute other grounds as explained in Rios v. Paramo*, 2016 WL 8731085, *41 (S.D. Cal. July 15, 2016). The *Cleburne* court further confirmed, however, that "(t)he general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *Id*. at 440.

In the instant case, not only have Oregon's restaurants and taverns been unequally singled out by the Governor, there is no rational basis to have done so. EO 20-65 arbitrarily places crippling restrictions on Oregon's various restaurants and taverns that it does not place on other similarly situated commercial enterprises and completely removes any possibility of conducting a substantial portion of any typical bar or restaurant operation, namely the ability of such establishments to permit their patrons to enjoy food or drink on site, whether in indoor seating or in outdoor seating. During the defined two week "freeze period" set forth by EO 20-65, "restaurants, bars, taverns, brew pubs, wine bars, wineries, cafes, food courts, coffee shops, clubs or other similar establishments that offer food or drink may not offer or allow on-premises consumption of food or drink, ***inside or outside***." EO 20-65, ¶ 4 a. (1) (emphasis added). The only method permissible for such businesses to stay in business is to offer take-out, drive through, or delivery. However, similarly situated businesses whose businesses could and sometimes do involve food and drink service (e.g. ordinary workplaces, government buildings, health care facilities, child care facilities, emergency response activities, school-based food programs) are expressly exempted. EO 20-65, ¶ 4 a. (2).

There has been no apparent attempt by Defendant to articulate why this discrepancy in treatment is warranted toward Plaintiffs or those whom Plaintiffs represent. This is particularly striking when public reports indicate there appears to be no real data to show that Oregon restaurants and bars pose any greater risk than any other business in Oregon.[3] Yet, EO 20-65 differentiates between workplaces that serve food or drinks to employees, and restaurants and bars. And just as significantly, the Oregon Health Authority's recent COVID-19 Weekly Report, published November 18, 2020, did not demonstrate any particular facts or data that linked recent COVID-19 cases to restaurant or bar establishments in Oregon.[4]

In addition, EO 20-65 is not rationally based in facts because it permits activities to take place in ordinary residential homes that would be and now are barred in better ventilated commercial structures like restaurants at the risk of criminal penalty to a restaurateur who "knowingly" violates the Order. Restaurants are subject to commercial building code standards in Oregon and must provide adequate ventilation for safe and sanitary airflow. Brandt Dec., ¶ 5. It is not rationally based on the evidence to restrict, as EO 20-65 does, any dining indoors or outdoors at a restaurant while permitting up to 6 persons of two different households to gather in

---

[3] *See Is indoor dining safe? Oregon's data can't say*, August 6, 2020, available at https://www.opb.org/article/2020/08/07/bar-restaurant-coronavirus-safe-oregon/ (last visited November 19, 2020) ("In our data, there is no clear evidence of significant transmission in bars or restaurants," Oregon state epidemiologist Dean Sidelinger said to members of the media in July when a reporter asked if it was safe to keep bars open.). *See also id.* (So have barkeeps, servers and their patrons in Oregon figured out how to safely gather indoors? Or is there a different reason Oregon health officials aren't seeing transmission in bars and restaurants? "The fact is, we aren't really quantifying it," said Ann Thomas, a senior health advisor at the Oregon Health Authority.).

[4] *See* COVID-19 Weekly Report, Oregon Health Authority, Oregon Public Health Division, available at https://www.oregon.gov/oha/PH/DISEASESCONDITIONS/DISEASESAZ/Emerging%20Respitory%20Infections/Weekly-COVID-19-Report.pdf (last visited November 20, 2020).

homes that are not subject to the stricter and safer mask-wearing (while not eating) and ventilation guidelines under which restaurants operate.

There is no rational basis for the restrictions in EO 20-65 that bar completely all indoor and outdoor dining on site at a food or drink establishment.

**b. Improper Delegation.**

Plaintiffs are also likely to succeed on the merits of their Delegation claim. As recently recognized by the Oregon Supreme Court, "the Governor's emergency powers under ORS chapter 401 are limited by the state and federal constitutions. Therefore, although the state's police powers include the power to impose reasonable public safety regulations, courts may intervene if the regulations exceed constitutional limits." *Elkhorn Baptist Church v. Brown*, 366 Or 506, 526 (2020). As *Elkhorn* recognizes while citing the United States Supreme Court:

> We say necessities of the case, because it might be that an acknowledged power of a local community to protect itself against an epidemic threatening the safety of all might be exercised in particular circumstances and in reference to particular persons in such an arbitrary, unreasonable manner, or might go so far beyond what was reasonably required for the safety of the public, as to authorize or compel the courts to interfere for the protection of such persons.

*Jacobson v. Commonwealth of Massachusetts*, 197 US 11, 28, 25 S Ct 358, 362, 49 L Ed 643 (1905).

Under ORS 401.168(1), however, during a state of emergency the Governor "has complete authority over all executive agencies of state government and *the right to exercise*, within the area designated by the proclamation, *all police powers vested in the state* by the Oregon Constitution in order to effectuate the purposes of this chapter." (Emphasis added)

This delegation of "all police powers of the state" necessarily goes too far in this case. "[A]n exercise of the police power of the state * * * is within the legitimate sphere of the

legislative power." *Hofer v. Carson*, 102 Or 545, 548 (1922). By ceding all of the police powers to the Governor, the legislative power has been improperly delegated to the Governor because such police powers necessarily encompass matters within the legislature's power.

> Under our Constitution, article 4, § 1, the power to make and declare laws, subject only to the initiative and referendum powers reserved to the people, is vested exclusively in the legislative assembly, and by article 3, § 1, the powers of government are divided into three departments, namely, the legislative, the executive, including the administrative, and the judicial, and each of said departments is prohibited from exercising any of the powers conferred upon either of the others. *Under these provisions the Legislature cannot confer upon any person, officer, agency, or tribunal the power to determine what the law shall be.* (Emphasis added)

*Van Winkle v. Fred Meyer, Inc.*, 151 Or 455, 461–62, 49 P2d 1140, 1143 (1935). ORS 401.168(1) is an unconstitutional delegation of legislative authority on its face. It is the basis of EO 20-65. Plaintiffs have shown likelihood of success on the merits of this claim.

**c. Dormant Commerce Clause claim.**

The same holds for Plaintiffs' claims under the Dormant Commerce Clause. As alleged in the Complaint, EO 20-65 impermissibly burdens in-state commerce to the benefit of commerce in neighboring states by requiring Plaintiffs' customers or those who wish to become Plaintiffs' customers, to leave Oregon to be able to enjoy indoor or outdoor dining on premises and burdens the entire food service industry supply chain within Oregon and to Oregon. Plaintiffs ask that the Court take judicial notice of the current status of the states that border Oregon, all of which appear to allow at least outdoor dining for restaurants at this time.[5]

---

[5] Washington permits outdoor dining with restrictions under Proclamation 20-25.8, *see* https://www.governor.wa.gov/sites/default/files/proclamations/proc_20-25.8.pdf (last visited November 19, 2020); Idaho permits indoor and outdoor dining under Governor Brad Little's November 13, 2020 order with restrictions, *see* https://coronavirus.idaho.gov/wp-content/uploads/2020/11/stage-2-modified-order.pdf (last visited November 19, 2020); California appears to permit at least some dine-in, outdoor dining, and take out for restaurants, *see* https://covid19.ca.gov/industry-guidance/ (last visited November 19, 2020); and Nevada also

Burdening the businesses in Oregon, as well as their interstate supply lines is improper. Plaintiffs are likely to succeed on the merits of this claim as well.

**d. Takings Claims.**

The record also demonstrates likelihood of success on the merits for the Oregon statutory and Fifth Amendment Takings claims. The critical statute for the Oregon statutory claim is ORS 433.411, which describes the powers of the Governor concerning public health emergencies. It provides as follows:

> (1) Upon the occurrence of a public health emergency, the Governor may declare a state of public health emergency as authorized by ORS 433.441 to 433.452 to protect the public health.
>
> (2) A proclamation of a state of public health emergency must specify:
>
> (a) The nature of the public health emergency;
>
> (b) The political subdivision or geographic area subject to the proclamation;
>
> (c) The conditions that have brought about the public health emergency; and
>
> (d) The duration of the state of public health emergency, if the duration is less than 14 days.
>
> (3) During a public health emergency, the Governor may:
>
> (a) Close, order the evacuation of or the decontamination of any facility the Governor has reasonable cause to believe may endanger the public health.
>
> (b) Regulate or restrict by any means necessary the use, sale or distribution of food, fuel, medical supplies, medicines or other goods and services.

---

appears to allow indoor and outdoor dining under its Planning Guide for Food Establishments, *see* https://media.southernnevadahealthdistrict.org/download/COVID-19/reopening/snhd-reopening-planning-food-establishments.pdf (last visited November 19, 2020).

> (c) Prescribe modes of transportation, routes and destinations required for the evacuation of individuals or the provision of emergency services.
>
> (d) Control or limit entry into, exit from, movement within and the occupancy of premises in any public area subject to or threatened by a public health emergency if such actions are reasonable and necessary to respond to the public health emergency.
>
> (e) Authorize pharmacists licensed under ORS chapter 689 to administer vaccines to persons who are three years of age or older.
>
> (f) Take any other action that may be necessary for the management of resources, or to protect the public during a public health emergency, including any actions authorized under ORS 401.168, 401.185, 401.188 and 401.192.

> (4) Nothing in ORS 433.441 to 433.452 limits the authority of the Governor to declare a state of emergency under ORS 401.165. If a state of emergency is declared as authorized under ORS 401.165, the Governor may implement any action authorized by ORS 433.441 to 433.452.
>
> (5) A proclamation of a state of public health emergency expires when terminated by a declaration of the Governor or no more than 14 days after the date the public health emergency is proclaimed unless the Governor expressly extends the proclamation for an additional 14-day period.
>
> **(6) When real or personal property is taken under power granted by this section, the owner of the property shall be entitled to reasonable compensation from the state.**

ORS 433.441(1)-(6). (Emphasis added.)

Defendant has seized and made unusable Plaintiffs' real and personal property without compensation Plaintiffs' by forcing the limitations of EO 20-65 upon them, taking such property for a public purpose or public use. Defendant has therefore placed the burden and cost for any public benefit that EO 20-65 might create upon the shoulders of private businesses like those of Plaintiffs and their members without any compensation for such taking. The toll of these actions

upon those in this industry is plainly provided for in the record. *See* Rosendahl Dec. ¶¶ 3-8; Brandt Dec., ¶¶ 2-4; West Dec., ¶¶ 2-4.

This represents a clear taking that should be compensated and, for the short term, placed under a temporary restraining order so that Plaintiffs and those similarly situated do not continue to unfairly bear the brunt of EO 20-65.

**2. Plaintiffs are likely to suffer irreparable harm.**

Under any of the Claims that Plaintiffs bring, moreover, there is a substantial risk of irreparable harm to Plaintiffs or to those whom they represent in this critical industry. The Ninth Circuit has recognized that the ***threat*** of putting plaintiffs' constituents "out of business" is a sufficient basis to establish irreparable harm. *See Los Angeles Memorial Coliseum Commission v. National Football League*, 634 F.2d 1197, 1202-03 (9th Cir. 1980) ("Other than the threat of loss of revenues, the plaintiff did not demonstrate any threat of harm that would have supported a finding of irreparable injury. * * * [Plaintiff did not] contend or show that loss of the Raiders as a tenant threatened to put it or the Coliseum out of business."). *See Foremost Intern Torus, Inc. v. Qantas Airways Ltd.*, 379 F. Supp. 88, 97 (D.Haw. 1974), aff'd, 525 F.2d 281 (9th Cir. 1975), cert. denied, 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976) ["The danger that Foremost will suffer irreparable injury before the CAB has investigated the charges of deceptive practices and unfair methods of competition is very real. Foremost has established **that the existence of its business life** as a competitor in the freewheeling tour market is threatened." (Emphasis added.)] *See also Retail Imaging Management Group, LLC v. Fujifilm North America Corp.*, 841 F.Supp.2d 1189, 1195 (D.Or. 2012) ("In conclusion, the threatened destruction of a business may, under certain circumstances, be sufficient to satisfy the requirement that a movant show a 'likelihood of irreparable injury.'"). Moreover, conduct that requires an organization to divert

resources in disservice to its core mission "qualifies as sufficient irreparable harm." *Doe v. Trump*, 418 F. Supp. 3d 573, 599 (D. Or. 2019, Simon, J.).

Evidence of irreparable harm is present in the evidence before the Court. Several hard-hit Oregon restaurant ventures have already suffered substantial harm to their businesses since the time the COVID-19 pandemic began. West Dec., ¶¶ 2-3 (detailing devastating revenue loss of approximately $500,000 in revenue, reductions in employees, and lost sales). Under EO 20-65, even if it is to be only two weeks, will cause additional irreparable harm that will only increase should Defendant extent EO 20-65 longer. West Dec., ¶ 4 (anticipating unsustainable losses of up to $100,000 over the next two weeks that if continued will result in business closures). There is a substantial threat to the ongoing livelihood of longtime Oregon institutions, such as the Old Spaghetti Factory locations in Oregon. Griffith Dec., ¶ 2. Its restaurant sales have been down significantly when comparing November 2019 and November 2020, which losses cannot continue to be sustained. Griffith Dec., ¶ 3. EO 20-65 will have a substantially adverse impact that could include team members losing their jobs, training costs, reduced hours that put financial pressure on employees, and sales reductions that might not permit reopening without significant outside support. Griffith Dec., ¶ 3. The longer EO 20-65 remains in place the harder it will be to reopen at all. Rosendahl Dec., ¶ 7. This creates the very real possibility, even likelihood that businesses will close.

In addition, the upcoming Thanksgiving week is a critical time for Oregon restaurants to be open to the fullest extent possible. As the record shows, Plaintiffs' representatives need to be open for this week to employ and pay their employees and staff during a traditionally busy week in the restaurant business. Brandt Dec., ¶ 6. The harm presented here will only grow if EO 20-65 is expanded beyond two weeks, which is expressly written into the text of this Order as being

within Defendant's sole power to do. EO 20-65, ¶ 1 ("This Executive Order is effective Wednesday November 18 through Wednesday December 2, unless extended or terminated earlier by the Governor.").

**3. The balance of equities tips in Plaintiffs' favor.**

As noted above, when the government is a party, the last two factors of the injunction analysis merge. *Drakes Bay Oyster Co.*, 747 F.3d at 1092; *Index Newspapers LLC,* -- F.Supp. 3d --, 2020 WL 4883017, *26. Even so, there are important points to distinguish as to each factor. "Under the 'balance of equities' analysis, a court must 'balance the competing claims of injury' and 'consider the effect on each party of the granting or withholding of the requested relief.'" *Don't Shoot Portland v. City of Portland*, 465 F. Supp. 3d 1150, 1156 (D.Or., Hernandez, J.) (quoting *Winter*, 555 U.S. at 24, 129 S. Ct. 365 (internal quotation marks omitted)). If the alleged government action violates federal law, "the public interest factor generally weighs in favor of the plaintiff." *Doe*, 418 F. Supp. 3d at 599

It goes without saying that the COVID-19 pandemic has impacted almost every sector of life for Oregonians. However, EO 20-65 inequitably shifts a disproportionate share of the burden onto the restaurant industry, Plaintiffs, and those whom Plaintiffs represent. As noted above, EO 20-65 does not treat food and drink business equally in terms of food and beverage services even if they offer substantially similar services. EO 20-65 renders useless the substantial capital commitment and effort that has been put into outdoor dining facilities in reliance on the idea that at least outdoor dining would remain an available option. Rosendahl Dec., ¶ 5 (over $5,000 spent to modify indoor and outdoor spaces); Brandt Dec., ¶ 3 (ORLA members have placed substantial investment into indoor and outdoor dining facilities).

/ / /

Simply put, the burden that EO 20-65 places on Plaintiffs and their members is disproportionately high such that the enforcement of this Order should be temporarily restrained.

**4. A TRO and Preliminary Injunction are in the public's best interests.**

"The public interest inquiry primarily addresses impact on non-parties rather than parties." *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014) (internal quotation marks omitted). As was discussed in another case within this District, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Index Newspapers LLC*, 2020 WL 4883017, at *26 (Quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quotation marks omitted) (granting an injunction under the Fourth Amendment)).

Plaintiffs here have pleaded several claims that pertain to their rights under the Constitution, including claims for violations of due process, equal protection, and claims under the Dormant Commerce Clause. Preventing these continued violations imposed by EO 20-65 on not only Plaintiffs but all those similarly situated to Plaintiffs, and indeed the general public in Oregon as a whole, are in the public's best interest. This is particularly so where the reasons for the restrictions are not supported by a rational basis.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

## CONCLUSION

Plaintiffs request the Court issue a temporary restraining order and an order requiring Defendant to appear and show cause why a preliminary injunction should not issue.

DATED this 20th day of November, 2020.

JORDAN RAMIS PC

By: *s/ Edward H. Trompke*

Edward H. Trompke, OSB #843653
ed.trompke@jordanramis.com
Joseph A. Rohner IV, OSB #064919
joseph.rohner@jordanramis.com
Christopher K. Dolan, OSB #922821
chris.dolan@jordanramis.com
Two Centerpointe Dr 6th Flr
Lake Oswego OR 97035
Telephone: (503) 598-7070
Telephone: (503) 598-7070
Facsimile: (503) 598-7373

*Attorneys for Plaintiffs Oregon Restaurant and Lodging Association and Restaurant Law Center*

Angelo I. Amador (*Pro Hac Vice* Admission Pending)
aamador@restaurant.org
RESTAURANT LAW CENTER
2055 L Street, NW, Suite 700
Washington, DC 20036
Telephone: (202) 492-5037
Facsimile: (202) 331-2429

*Attorney for Plaintiff Restaurant Law Center*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the applicable word-count limitation under LR 7-2(b), 26-3(b), 54-1(c), or 54-3(e) because it contains 4,917 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.

DATED: November 20, 2020.

*s/ Edward H. Trompke*

Edward H. Trompke, OSB #843653
ed.trompke@jordanramis.com
Joseph A. Rohner IV, OSB #064919
joseph.rohner@jordanramis.com
Attorneys for Plaintiffs Oregon Restaurant and Lodging Association and Restaurant Law Center

Angelo I. Amador (*Pro Hac Vice* Admission Pending)
aamador@restaurant.org
Attorney for Plaintiff Restaurant Law Center