ELLEN F. ROSENBLUM
Attorney General
SHEILA H. POTTER  #993485
BRIAN SIMMONDS MARSHALL  #196129
Senior Assistant Attorneys General
Department of Justice
100 SW Market Street
Portland, OR 97201
Telephone: (971) 673-1880
Fax: (971) 673-5000
Email:  Sheila.Potter@doj.state.or.us
        Brian.S.Marshall@doj.state.or.us

Attorneys for Defendant Governor Kate Brown

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| OREGON RESTAURANT AND LODGING ASSOCIATION, an Oregon Domestic Non-Profit Corporation; and RESTAURANT LAW CENTER, <br><br>       Plaintiffs, <br><br>   v. <br><br> KATHERINE "KATE" BROWN, in her official capacity as the Governor of the State of Oregon, <br><br>       Defendant. | Case No.  3:20-cv-02017-YY <br><br> DEFENDANT'S RESPONSE TO MOTION FOR TEMPORARY RESTRAINING ORDER |

Page i -    DEFENDANT'S RESPONSE TO MOTION FOR TEMPORARY RESTRAINING ORDER

# TABLE OF CONTENTS

I.     **INTRODUCTION** ............................................................................. 1

II.    **FACTUAL BACKGROUND** ............................................................ 2

A.   COVID-19 ............................................................................................ 2

B.   The Governor's Executive Orders ....................................................... 4

C.   Restaurants and the Spread of COVID-19 .......................................... 5

III.   **TEMPORARY RESTRAINING ORDER STANDARD** ............................ 6

IV.   **ARGUMENT** ............................................................................... 7

A.   ORLA has not raised serious questions going to the merits, let alone established that it is likely to succeed on the merits. ......................................... 7

    1.   EO 20-65 is consistent with the Equal Protection Clause ....................... 7

        a.   The State's purpose is legitimate. ................................................ 8

        b.   EO 20-65 is rationally related to the state interest. ..................... 8

        c.   If the Court finds an equal protection violation, the State should be given a choice of remedies. ...................................... 11

    2.   ORLA's nondelegation claim under Oregon law is meritless and barred by the Eleventh Amendment. ................................................ 12

    3.   EO 20-65 does not violate the dormant Commerce Clause. .................. 14

    4.   ORLA's federal and state takings claims are unlikely to succeed. .......... 16

        a.   The Takings Clause provides no basis for injunctive relief and EO 20-65 is not a taking. ................................................... 16

        b.   ORS 433.441 is unenforceable in federal court, provides no claim against the Governor, provides no equitable remedy, and does not apply to EO 20-65's restrictions on restaurants. ......................... 19

B.   ORLA cannot demonstrate irreparable harm. .................................... 20

C.   The balance of equities favors the State. ........................................... 21

V.   **CONCLUSION** ........................................................................... 23

# I.  INTRODUCTION

The novel coronavirus is sweeping through Oregon at a rate many times greater than when the emergency began.  More than a thousand new cases are reported every day now.  People are dying.  Hospitals are filling.  And epidemiologists and scientists agree that the greatest risk of spread comes in situations in which people are in close proximity to each other, unmasked, especially as the length of time spent in those situations extends.

Oregon Governor Kate Brown is trying to keep as many Oregonians alive as possible, and to keep the cases in the state from overwhelming Oregon's hospitals.  The Executive Order at issue here directs a two-week "freeze" on a variety of activities, including indoor and outdoor on-site dining—where people sit in close proximity to each other, unmasked, for extended periods of time, often in enclosed spaces.

The Governor's early orders, and Oregonians' efforts to "flatten the curve" allowed Oregon to keep its new cases at less than 100 per day through the spring.  The numbers climbed as the pandemic wore on over the summer, but slowly, increasing and then dropping again.  But as summer ended, as the rain began, as cold weather set in, the numbers of new cases started to climb again, and this time the increases were steep and sustained.  In September, new cases were in the range of 200 to 300 a day.  On November 20, more than 1300 new cases were reported, and more than 1500 cases were reported the next day.

The freeze ordered by Governor Brown is reasonable, it is supported by science, and it is within her authority to issue.  Plaintiffs' and their members' constitutional rights are not impeded by the Governor's order.  The limits placed on Oregonians' activities are frustrating and painful, but they are necessary for the preservation of human life.

Plaintiffs Oregon Restaurant and Lodging Association and the Restaurant Law Center (collectively, "ORLA") argue that this Court should enjoin Executive Order 20-65 (EO 20-65) under a variety of theories.  None of those theories support an injunction.  ORLA has not shown that it is likely to succeed on any of its claims, nor even that it has raised substantial questions

Page 1 -   DEFENDANT'S RESPONSE TO MOTION FOR TEMPORARY RESTRAINING ORDER

going to the merits of any of its claims. ORLA argues that EO 20-65 violates its members' rights under the Equal Protection Clause of the Fourteenth Amendment, but it concedes that the traditional standard of review applies, under which it would have to demonstrate that EO 20-65 imposes measures that are *irrelevant* to the State's legitimate interest in preserving the lives and health of Oregonians. It cannot do that. And ORLA cannot prevail on the nondelegation claim, because this Court does not have jurisdiction to hear a state-law claim against a sovereign state. ORLA has made no showing that the dormant Commerce Clause applies to EO 20-65 *intra*state regulations at all, let alone that EO 20-65 actually violates that clause by disfavoring out-of-state businesses. And ORLA's takings claims are unlikely to succeed because EO 20-65 is not a taking and if it were, the only remedy available would be damages, not an injunction. ORLA also has not demonstrated that EO 20-65, as opposed to the pandemic itself, has caused irreparable injury. And if the Court reaches the point of balancing equities, the public interest in preserving the lives and health of Oregonians must outweigh the countervailing equities identified by ORLA.

## II. FACTUAL BACKGROUND[1]

### A.  COVID-19

The day ORLA filed this lawsuit, Oregon set a record for the number of new COVID-19 cases: 1,306.[2]  That record was broken the next day, when 1,509 new cases were confirmed.[3]

---

[1] "[T]he rules of evidence do not apply strictly to preliminary injunction proceedings." *Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1250 n.5 (9th Cir. 2013). The State has cited herein to a number of documents from highly respected and authoritative sources relating to the worldwide COVID-19 crisis, such as the Oregon Health Authority, and the Court should consider that evidence in finding facts on this motion. In any case, none of these citations is to material that cannot be "accurately or readily ascertained," and the Court can therefore take judicial notice of these facts. Fed. R. Evid. 201(b).

[2] oregon.gov/oha/ERD/Pages/Oregon-reports-1306-new-confirmed-and-presumptive-COVID-19-cases-4-new-deaths.aspx (last accessed Nov. 20, 2020).

[3] https://www.oregon.gov/oha/ERD/Pages/Oregon-reports-1509-new-confirmed-and-presumptive-COVID-19-cases-7-new-deaths.aspx (last accessed Nov. 22, 2020).

Page 2 -  DEFENDANT'S RESPONSE TO MOTION FOR TEMPORARY RESTRAINING ORDER

The effective reproduction number for COVID-19 is 1.47 in Oregon—that is, under the current conditions, every 100 individuals infected with COVID-19 in turn infect 147 others.[4]  In sum, the prevalence of COVID-19 is increasing rapidly in Oregon, and hospitals' capacity to take on the rising number of sick patients is constrained.[5]

COVID-19 spreads primarily through human-to-human contact.[6]  Not every interaction with an infected person carries the same risk: the length of time of the exposure, the distance between the people, whether the people are using face-coverings, and the ventilation of the environment (e.g., indoor versus outdoor) are all important factors in whether an interaction results in infection.[7]  Keeping cohorts small when people do come together can limit spread if a person in the group is infected, and can avoid the sort of "super spreader" events that can rapidly increase case counts in a community.  Testing and tracing infections is also an important component of public health strategy.  But that too is not a failsafe, particularly given that people can infect others even when they are not symptomatic themselves.[8]

Because encountering more individuals necessarily increases the risk of encountering someone who is infectious, larger groups are inherently riskier than smaller ones.  The risk of increasing group size is non-linear: a group of 20 is more likely than a group of 6 to include at least one infectious person, and an infectious person could infect more people in a larger group than in a smaller one.  In addition, someone newly infected can in turn infect others.  Experts do

---

[4] Declaration of Dr. Dean Sidelinger ¶ 10 (citing Oregon Health Authority, Status Update: COVID-19 Epidemic

Trends and Projections In Oregon (Nov. 13, 2020) *available at* ttps://www.oregon.gov/oha/PH/DISEASESCONDITIONS/DISEASESAZ/Emerging%20Respitory%20Infections/Epidemic-Trends-and-Projections.pdf).

[5] *Id.* ¶ 23.

[6] *Id.* ¶ 4.

[7] *Id.* ¶ 11.

[8] *Id.* ¶ 6.

Page 3 -   DEFENDANT'S RESPONSE TO MOTION FOR TEMPORARY RESTRAINING ORDER

not yet know the precise causes of super-spreader events.  Consequently, the most effective way to stop super-spreader events is to prevent large groups from congregating.

More than a quarter-million people have died of COVID-19 in the United States to date,[9] more than 800 of them in Oregon, roughly 1.3 percent of those who have become infected.[10] The long-term effects on those who survive the disease are unknown.

## B.  The Governor's Executive Orders

Since the Governor exercised her authority under Oregon law to declare a state of emergency in March, she has issued a series of Executive Orders to limit the spread of the virus. Despite these efforts, the Governor examined the evidence and determined that "[t]he dreaded winter surge is here. …The situation is dire, and requires an urgent, immediate, and decisive response to quell the current surge in COVID-19 infections, before it is too late."[11]

The Governor therefore issued Executive Order 20-65, which institutes a "temporary freeze" from November 18 through December 2.[12]  Most relevant to this case, "restaurants, bars, taverns, brew pubs, wine bars, wineries, cafes, food courts, coffee shops, clubs, or other similar establishments that offer food or drink" (collectively, "restaurants") "may not offer or allow on-premises consumption of food or drink, inside or outside" for that two-week period.[13] Restaurants may continue to offer take-out, drive-through, and delivery options.

EO 20-65 also closes numerous other places, including gyms, pools and other sports facilities, museums and other indoor recreational activities, event venues, and zoos and other

---

[9] *Id.* ¶ 7 (citing https://covid.cdc.gov/covid-data-tracker/#cases_casesinlast7days (last accessed Nov. 20, 2020)).

[10] *Id.* (citing https://govstatus.egov.com/OR-OHA-COVID-19 (last accessed Nov. 20, 2020)).

[11] Executive Order 20-65, preamble, *available at* https://www.oregon.gov/gov/admin/Pages/eo_20-65.aspx.

[12] *Id.* ¶¶ 1–2.

[13] *Id.* ¶ 4(a)(1).

Page 4 -    DEFENDANT'S RESPONSE TO MOTION FOR TEMPORARY RESTRAINING ORDER

outdoor entertainment activities.[14]  "Work in offices is prohibited whenever telework and work-at-home options are available … ."[15]  In-home and other social gatherings "are limited to a maximum of 6 people, from not more than two households."[16]  It also continues other sector-specific rules.[17]

Outside of the two weeks governed by EO 20-65, restaurants are regulated by EO 20-27, as extended by EO 20-59.[18]  Under that order, since counties left the baseline phase, they have been permitted to reopen for dine-in service consistent with Oregon Health Authority guidance.[19]

## C.    Restaurants and the Spread of COVID-19

"The risk of transmission differs among settings."[20]  Factors increasing the risk of the spread of COVID-19 include the number of individuals congregating, the length of exposure, and whether they are wearing face coverings like masks.[21]  Because restaurants bring together individuals from different households for substantial lengths of time, groups may be sitting in close proximity across a table, and patrons have to remove their masks to eat and drink, dining in restaurants carries a significant risk of infection.[22]  Multiple studies have confirmed that restaurants are a significant source of community spread.[23]  Public health officials cannot

---

[14] *Id.* ¶¶ 4(a)(2), 4(b).

[15] *Id.* ¶ 5(a).

[16] *Id.* ¶ 3(a).

[17] *Id.* ¶ 3(d).

[18] Governor Brown's executive orders relevant to this action before EO 20-65 was instituted are listed in Executive Order 20-59, which extends Oregon's state of emergency through January 2, 2021, and continues prior Executive Orders. *Available at* https://www.oregon.gov/gov/admin/Pages/eo_20-59.aspx. Many of these executive orders also directed state agencies to issue and periodically amend enforceable guidance to implement those orders.

[19] Executive Order 20-27 ¶ 15(b)(1).

[20] Sidelinger Decl. ¶ 11.

[21] *Id.*

[22] *Id.* ¶¶ 14, 19.

[23] *Id.* ¶ 13.

Page 5 -   DEFENDANT'S RESPONSE TO MOTION FOR TEMPORARY RESTRAINING ORDER

definitively determine the number of infections that have occurred in restaurants in Oregon.[24]
Due in part to the strained capacity of contact tracers, 30 percent of Oregon infections throughout
the pandemic (and 50 percent of November cases) have not been linked to a known source of
infection.[25]

Public health experts agree that outdoor dining at restaurants is less risky than indoor
dining but that pickup and delivery is the safest option.[26]  In addition, many "outdoor" spaces in
Oregon have been enclosed for winter weather, limiting ventilation.[27]

### III. TEMPORARY RESTRAINING ORDER STANDARD

ORLA has, for the most part, accurately stated the analysis for this Court in considering a
temporary restraining order or preliminary injunction.  Such relief is "an extraordinary remedy
that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."
*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)

A plaintiff seeking a preliminary injunction must establish four factors: (1) a likelihood
of success on the merits, (2) likely irreparable harm in the absence of preliminary relief, (3) that
the balance of equities tips in its favor, and (4) that an injunction is in the public interest.  *See*
*Winter*, 555 U.S. at 20.  As ORLA notes, when the government is a party, courts consider the last
two factors together, because the equities for the State consist of the public interest in a case such
as this.  *See Nken v. Holder*, 556 U.S. 418, 435 (2009).  A plaintiff must establish each of the
required elements; the failure to establish any one of the elements is fatal to its motion. *Winter*,
555 U.S. at 20–21.

The Ninth Circuit permits courts to balance the first and third factors, such that "serious
questions going to the merits" in combination with a balance of hardships that tips *sharply*
towards the plaintiff can satisfy those two factors, so long as the plaintiff also shows that there is

---

[24] *Id.* ¶ 16.

[25] *Id.* ¶ 15.

[26] *Id.* ¶ 14.

[27] *Id.*

Page 6 -   DEFENDANT'S RESPONSE TO MOTION FOR TEMPORARY RESTRAINING ORDER

a likelihood of irreparable injury.  *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).  Because the third and fourth factors are considered together, the *Alliance* balancing test would require ORLA to show serious questions going to the merits of its claims, and also that the balance of equities tips sharply in its favor—that is, its own irreparable injury greatly exceeds the public interest served by EO 20-65.  In the alternative, ORLA would have to demonstrate a likelihood of success on the merits, irreparable injury, and that the balance of equities and public interest tips in its favor.

## IV. ARGUMENT

ORLA's motion for a temporary restraining order should be denied.  As Section A argues, ORLA has not established a likelihood of success on the merits—or even serious questions going to the merits—of its claims.  Section B argues that ORLA has not showed irreparable injury resulting from Executive Order 20-65 itself, as opposed to the diminished consumer demand for dining in public spaces shared with strangers.  And Section C explains why the public interest in limiting sickness and death outweighs the equities ORLA identifies.

**A.    ORLA has not raised serious questions going to the merits, let alone established that it is likely to succeed on the merits.**

To prevail on the first factor, ORLA must establish either that it is likely to succeed on the merits of its claims, or *at a minimum* that there are serious questions going to the merits of its claims.  (The latter is the standard only if ORLA can *also* show that the balance of equities tips sharply in favor of granting the injunction.)  It cannot make this showing under either standard, as to any of its claims.

**1.    EO 20-65 is consistent with the Equal Protection Clause.**

ORLA's first claim for relief alleges that EO 20-65 violates the Equal Protection Clause because restaurants are treated differently from other businesses and operations.  ORLA has conceded that the traditional standard of review applies, "which requires only that the State's system be shown to bear some rational relationship to legitimate state purposes." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 40 (1973).

Page 7 -   DEFENDANT'S RESPONSE TO MOTION FOR TEMPORARY RESTRAINING ORDER

### a.     The State's purpose is legitimate.

The state purpose here is clear and explicit within the text of the Executive Order itself: The Governor is taking action to limit the surge in new cases, in an effort to save lives in the middle of a growing pandemic.  New COVID-19 cases are spiking around the state and test positivity is increasing at the same time.[28]  And, as cases increase, hospitals are seeing more COVID patients.  "Infection records are being set in states across the country.  This means we cannot look to other states to share their staffing and hospital beds because they too are experiencing the surge."[29]

The express stated purpose of EO 20-65, then, is that "Actions taken now will help prevent lives from being lost—not just from COVID-19, but from other diseases or accidents that lead people to need hospital-level care, which they would not be able to get if hospital beds and hospital staff are fully occupied with COVID-19 patients."[30]

And limiting the spread of disease is an appropriate goal for the Governor, as state officials are entrusted with the health and safety of their state's residents.  "Our Constitution principally entrusts '[t]he safety and the health of the people' to the politically accountable officials of the States 'to guard and protect.'"  *Jacobson v. Massachusetts*, 197 U.S. 11, 38 (1905), cited in *South Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613 (2020) (Roberts, C.J., concurring).

There can thus be no dispute that the state interest is legitimate, and that the Governor is entitled to act to protect that interest.

### b.     EO 20-65 is rationally related to the state interest.

Because the State interest is legitimate, the question for this Court under the Equal Protection Clause is whether there is some rational relationship between that interest and the

---

[28] *See* EO 20-65, at 2.

[29] Executive Order 20-65, preamble, *available at* https://www.oregon.gov/gov/admin/Pages/eo_20-65.aspx.

[30] *Id.*

Page 8 -   DEFENDANT'S RESPONSE TO MOTION FOR TEMPORARY RESTRAINING ORDER

Governor's order pausing on-site dining at restaurants.  And of course there is.  Restaurants and bars pose a heightened risk of COVID-19 spread.  Patrons sit at tables together, whether inside or outside, for extended lengths of time, without face coverings while they eat and drink.[31] Multiple epidemiological studies show that restaurants are likely to be a significant source of infection.[32]

This Court need not engage in the category-by-category comparison that ORLA asks it to undertake.  The question for this Court is whether there is a rational relationship between the government action (limiting restaurant service to take-out, delivery, and drive-through for a period of time) and the legitimate state interest (limiting the spread of COVID-19).  The State may take into account the differences between activities, including their different regulatory regimes, even though every interaction between people creates risks of infection. *See Calvary Chapel Dayton Valley v. Sisolak*, No. 320CV00303RFBVCF, 2020 WL 4260438, at *2 (D. Nev. June 11, 2020) (denying preliminary injunction of 50-person limit for religious services despite different treatment of casinos), *injunction pending appeal denied*, No. 19A1070, 2020 WL 4251360 (U.S. July 24, 2020).

Restaurants, of course, *are* unlike the other businesses ORLA points this Court to.  *See Vill. of Orland Park v. Pritzker*, No. 20-CV-03528, 2020 WL 4430577, at *11–12 (N.D. Ill. Aug. 1, 2020) (finding rational bases for distinguishing restaurants and bars from "salons, churches, office buildings, or grocery stores" in the context of COVID-19 restrictions). Childcare centers cannot operate on a drive-through basis; children must be on-site, or no childcare can happen; and those children need to be fed over the course of a day.  Homeless shelters cannot send their patrons home with a warm meal, as restaurants can.  Emergency response activities and government operations are plainly not "similarly situated" with restaurants.  And the home gathering limit (no more than six people, no more than two households) would be *more*

---

[31] Sidelinger Decl. ¶¶ 14, 19.

[32] *Id.* ¶ 13.

Page 9 -    DEFENDANT'S RESPONSE TO MOTION FOR TEMPORARY RESTRAINING ORDER

restrictive for restaurants than the current EO allows; restaurants could not staff their kitchens under that limitation, let alone permit patrons to enter. Restaurants are also different from retailers, where shoppers wear masks and contact is fleeting.[33]

But the Court need not engage in that comparison. "Only where state action impinges on the exercise of fundamental constitutional rights or liberties must it be found to have chosen the least restrictive alternative." *San Antonio Indep. Sch. Dist.*, 411 U.S. at 51. Even if the Court were to conclude that the Order could have given greater priority to restaurants or achieved numerical parity between all types of human activity, ORLA would not win. ORLA could not prevail on this claim unless it could show that the treatment of restaurants was *irrelevant* to the State's objective of limiting the spread of COVID:

> Although no precise formula has been developed, the Court has held that the Fourteenth Amendment permits the States a wide scope of discretion in enacting laws which affect some groups of citizens differently than others. The constitutional safeguard is offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective.

*McGowan v. Maryland*, 366 U.S. 420, 425–26 (1961). "The existence of 'some inequality' in the manner in which the State's rationale is achieved is not alone a sufficient basis for striking down the entire system. It may not be condemned simply because it imperfectly effectuates the State's goals." *San Antonio Indep. Sch. Dist.*, 411 U.S. at 51.

States have especially broad latitude to act to protect public health where the scientific risks are still being investigated and determined:

> When [state] officials "undertake [ ] to act in areas fraught with medical and scientific uncertainties," their latitude must be especially broad." *Marshall v. United States*, 414 U.S. 417, 427 (1974). Where those broad limits are not exceeded, they should not be subject to second-guessing by an "unelected federal judiciary," which lacks the background, competence and expertise to assess public health and is not accountable to the people. *See Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 545 (1985).

---

[33] Sidelinger Decl. ¶ 19.

Page 10 - DEFENDANT'S RESPONSE TO MOTION FOR TEMPORARY RESTRAINING ORDER

*South Bay United Pentecostal Church*, 140 S. Ct. at 1613 (Roberts, C.J., concurring).

Under rational basis review, the State's "choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data," particularly where it "must necessarily engage in a process of line-drawing." *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315–16 (1993). Here, however, the State's choice is supported by public health evidence. ORLA cannot succeed on its first claim, under the Equal Protection Clause, unless it could show that there is no rational relationship between that order and the state interest in preventing disease and death. It has not showed and cannot show a likelihood of success on that factor. The relationship is clear, and it is logical, and it is grounded in science.

### c.     If the Court finds an equal protection violation, the State should be given a choice of remedies.

"When the constitutional violation is unequal treatment . . . a court theoretically can cure that unequal treatment either by extending the benefits or burdens to the exempted class, or by nullifying the benefits or burdens for all." *Barr v. Am. Ass'n of Political Consultants, Inc.*, 140 S. Ct. 2335, 2354–55 (2020) (citing *Heckler v. Mathews*, 465 U.S. 728, 740 (1984)). The Executive Order here has a severability clause: "If any section, subsection, paragraph, subparagraph, sentence, clause, phrase, or word of this Executive Order is for any reason held to be invalid, such holding shall not affect the validity of the remaining portions of this Order." EO 20-65 ¶ 12. Thus, if an exemption from the sweep of the Executive Order renders it unconstitutional, the proper remedy is likely to invalidate only the exemption.

Here, the Governor can amend her own executive order. Accordingly, if this Court were to find a violation of the Equal Protection Clause, it should offer the Governor a choice between expanding and contracting EO 20-65's requirements. In *People Not Politicians Oregon v. Clarno*, for example, this Court offered the State two alternative remedies upon determining that its ballot initiative requirements were unconstitutional. *See* No. 6:20-CV-01053-MC, 2020 WL 3960440, at *7 (D. Or. July 13, 2020), *stayed on other grounds* 2020 WL 4589742, at *1 (U.S.

Page 11 -  DEFENDANT'S RESPONSE TO MOTION FOR TEMPORARY RESTRAINING ORDER

Aug. 11, 2020).  Given the enormous consequences for this State's public health, the Court should offer the State such a choice if a remedy is necessary in this case.

### 2.  ORLA's nondelegation claim under Oregon law is meritless and barred by the Eleventh Amendment.

ORLA also cannot succeed on its second claim, which argues that the legislature improperly delegated all police powers to the Governor in the event of an emergency, and that the Governor is wielding that power in violation of the Oregon Constitution.  (*See* Compl. ¶¶ 46–48, Pls.' Mot. at 9–10.)  But whether that delegation was proper is a question of state law, and the federal courts lack jurisdiction to hear a state-law claim against a sovereign state.  ORLA cannot show any substantial question on the merits here, because its claim is subject to outright dismissal.

As a sovereign in our constitutional system, an un-consenting state and its departments are immune from suit in federal court, regardless of the relief sought.  *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984).  The State's absolute sovereign immunity from suit generally also extends to state officials sued in their official capacities, as "the state is the real, substantial party in interest" in such suits.  *Id.* at 101 (internal quotation marks and citation omitted).

There is an exception to this rule, but it does not save ORLA's claims.  *Ex parte Young*, 209 U.S. 123 (1908), provides for a well-recognized—but limited—exception to this general rule, if the relief sought is "prospective injunctive relief to prevent a continuing violation of *federal law*."  *Green v. Mansour*, 474 U.S. 64, 68 (1985) (emphasis added).  This exception is premised on the proposition that federal court authority to enjoin "continuing violation of federal law [is] necessary to vindicate the federal interest in assuring the supremacy of that law."  *Id*.

Here, though, ORLA asks this Court to enjoin an alleged violation of state law. The claim does not fit within the *Ex parte Young* exception and is barred.  This is because "a federal court's grant of relief against state officials on the basis of state law does not vindicate the supreme authority of federal law."  *Seldovia Native Ass'n, Inc. v. Lujan*, 904 F.2d 1335, 1349–50 (9th Cir.

Page 12 - DEFENDANT'S RESPONSE TO MOTION FOR TEMPORARY RESTRAINING ORDER

1990) (citation and internal quotes omitted).  As the Supreme Court said in *Pennhurst*, "it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law …. Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment." 465 U.S. at 106.  *See also Hale v. State of Ariz.*, 967 F.2d 1356, 1369 (9th Cir. 1992), *on reh'g*, 993 F.2d 1387 (9th Cir. 1993) ("the Eleventh Amendment deprives federal courts of jurisdiction to order state actors to comply with state law").

This Court has consistently found that the State and its officers in their official capacity are immune in federal court from claims resting in state law:

> The Supreme Court has held that the Eleventh Amendment bars all state law claims "brought into federal court [against nonconsenting states] under pendent jurisdiction." *Pennhurst St. Sch. & Hosp. v. Halderman*, 465 U.S. 89, 121 (1984); *see also Fogelman v. Oregon*, 6:14-cv-02027-MC, 2015 WL 1822911, at *2 (D. Or. Apr. 20, 2015) (dismissing the plaintiff's state statutory claims on Eleventh Amendment grounds); *Drollinger v. Gerber*, No. 09-cv-134-AC, 2011 WL 7154483, at *5 (D. Or. Sept. 12, 2011) (granting summary judgment on the plaintiff's breach of contract claims against the state on Eleventh Amendment grounds), *findings and recommendation adopted*, 2012 WL 381215 (D. Or. Feb. 6, 2012); *Estate of Pond v. Oregon*, 322 F. Supp. 2d 1161, 1165 (D. Or. 2004) (granting summary judgment on the plaintiff's tort claims against the state on Eleventh Amendment grounds).

*Olsen v. Allen*, No. 3:18-cv-1208-SB, 2019 WL 1232834, at *5 (D. Or. March 15, 2019).

This prohibition is equally applicable where the law involved is not a legislatively enacted statute, but the state's constitution.  *See Vulliet v. Oregon*, No. 6:12-cv-492-AA, 2012 WL 4863710, at *6 (D. Or. Oct 10, 2012), *aff'd*, 701 Fed. Appx. 579 (9th Cir. 2017) ("The State also argues that plaintiff cannot bring a claim alleging violations of the Oregon Constitution. Again, the State is correct. The Eleventh Amendment 'bars the adjudication of pendent state law claims against nonconsenting state defendants in federal court.'… Thus, plaintiff's claim under the Oregon Constitution must be brought in state court and is dismissed.") (internal citations omitted).

Page 13 -  DEFENDANT'S RESPONSE TO MOTION FOR TEMPORARY RESTRAINING ORDER

Even if this Court could adjudicate a state law claim, ORLA's nondelegation claim would fail.  The Oregon Supreme Court has squarely held that the Governor has authority to exercise the entirety of the State's police powers to combat COVID-19: "through the enactment of ORS 401.168(1), the legislature has given the Governor authority to exercise the state's police powers during a state of emergency, and those powers include the power to regulate conduct for public health and safety."  *Elkhorn Baptist Church v. Brown*, 366 Or. 506, 525 (2020).

ORLA has failed to show any possibility of success on its second claim.

**3.    EO 20-65 does not violate the dormant Commerce Clause.**

ORLA has not shown a likelihood of success, or raised substantial questions going to the merits, of its dormant Commerce Clause claim either.  ORLA's motion argues that EO 20-65 "impermissibly burdens in-state commerce to the benefit of commerce in neighboring states" because its members' customers or prospective customers will leave Oregon to dine in restaurants in other states.  *See* Pls.' Mot. at 10.  ORLA also argues that EO 20-65 "burdens the entire food service industry supply chain" within and to Oregon. *Id.*  But neither argument shows any real potential for success on the merits.

The driving force of the dormant Commerce Clause is "concern about economic protectionism … designed to benefit in-state economic interests by burdening out-of-state competitors."  *Pharma. Rsch. & Mfrs. of Am. v. Cty. of Alameda*, 768 F.3d 1037, 1041 (9th Cir. 2014) (citing *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 337–38 (2008)).  EO 20-65 does not constitute economic protectionism or discriminate against interstate commerce.  ORLA argues (without evidence) that EO 20-65 *advantages* bordering states' restaurants by supposedly encouraging Oregonians to leave the state to dine in restaurants elsewhere.  Yet ORLA cites no authority for the claim that economically *advantaging* businesses in other states implicates the dormant Commerce Clause.  *See Savage v. Mills*, No. 1:20-CV-00165-LEW, 2020 WL 4572314, at *6 (D. Me. Aug. 7, 2020) (holding plaintiffs' "failure to substantiate how [quarantine orders]

Page 14 - DEFENDANT'S RESPONSE TO MOTION FOR TEMPORARY RESTRAINING ORDER

disfavor out-of-state businesses or hinder interstate commerce generally, is fatal to their dormant Commerce Clause claim").

And courts have consistently dismissed without further analysis challenges to intrastate regulations under the dormant Commerce Clause. *See, e.g.*, *Am. Trucking Ass'ns, Inc. v. Michigan Pub. Serv. Comm'n*, 545 U.S. 429, 434 (2005) (finding that a flat fee on intrastate transactions was consistent with the dormant Commerce Clause); *City of Los Angeles v. Cty. of Kern*, 581 F.3d 841, 847–48 (9th Cir. 2009) (declining to expand the dormant Commerce Clause's zone of interests to purely intrastate disputes where recyclers failed to establish that their financial injury was tied to a barrier to interstate commerce); *On The Green Apartments L.L.C. v. City of Tacoma*, 241 F.3d 1235, 1241–42 (9th Cir. 2001) (finding that a waste disposal law that imposed only an intrastate burden did not implicate the dormant Commerce Clause).

ORLA cannot establish a likelihood of success on the merits upon further analysis either. To determine whether state economic regulation violates the dormant Commerce Clause, courts take a two-tiered approach. *See Pharma Research & Mfrs. of Am. v. Cty. of Alameda*, 768 F.3d 1037, 1039–40 (9th Cir. 2014) (citing *Brown-Forman Distillers Corp. v. N. Y. State Liquor Auth.*, 476 U.S. 573, 578–79 (1986)). First, "[w]hen a state statute directly regulates or discriminates against interstate commerce" the statute is generally struck down "without further inquiry." *Brown-Forman*, 476 U.S. at 579 (citations omitted). This Executive Order does not do that.

Under the second tier, when a statute "has only indirect effects on interstate commerce and regulates even-handedly," courts conduct the balancing test articulated in *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970). *Id.* Under this balancing test, courts look to "whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits." *Id.* (citing *Pike*, 397 U.S. at 142). But ORLA has not made a case for concluding that EO 20-65 has even indirect effects on interstate commerce, as explained above. A regulation is not invalid because it "affects in some way the flow of commerce between the

Page 15 - DEFENDANT'S RESPONSE TO MOTION FOR TEMPORARY RESTRAINING ORDER

States." *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 948–49 (9th Cir. 2013) (internal quotations and citation omitted).

Therefore, the *Pike* analysis should be unnecessary, inasmuch as EO 20-65 does not even indirectly disadvantage interstate commerce. But if this Court were to engage in the *Pike* analysis, it still should find that ORLA cannot establish a likelihood of success on the merits on either part of the balancing test. The State has a legitimate state interest in reducing the spread of COVID-19. The local benefits of temporary restrictions would outweigh any incidental burden on interstate commerce.

For all these reasons, EO 20-65 does not violate the dormant Commerce Clause.

**4.    ORLA's federal and state takings claims are unlikely to succeed.**

      **a.    The Takings Clause provides no basis for injunctive relief and EO 20-65 is not a taking.**

ORLA argues it is entitled to a preliminary injunction based on the Takings Clause of the Fifth Amendment, which provides that "private property [shall not] be taken for public use, without just compensation." Injunctive relief is unavailable to remedy a taking, and ORLA's members have no takings claim in any case.

First, as ORLA's Complaint implicitly recognizes,[34] "[a]s long as an adequate provision for obtaining just compensation exists, there is no basis to enjoin the government's action effecting a taking." *Knick v. Township of Scott, Pennsylvania*, 139 S. Ct. 2162, 2176 (2019). Such a damages remedy is available for a takings claim, as explained below (Section IV.B), and thus the equitable remedy is precluded.

Second, ORLA cannot establish that EO 20-65 is a taking of its members' property. A regulatory taking like the one ORLA alleges is analyzed under the three-pronged *Penn Central* test. "*Penn Central* instructs [the Court] to consider '[1] the regulation's economic impact on the

---

[34] *Compare* Complaint ¶¶ 59–60 (seeking a damages remedy for its takings claim) *with id.* ¶¶ 31, 37, 44, 48 (alleging "Plaintiffs have no adequate remedy at law for" the first four claims for relief).

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

claimant, [2] the extent to which the regulation interferes with distinct investment-backed expectations, and [3] the character of the government action.'" *Colony Cove Props., LLC v. City of Carson*, 888 F.3d 445, 450 (9th Cir. 2018) (quoting *MHC Fin. Ltd. P'ship v. City of San Rafael*, 714 F.3d 1118, 1127 (9th Cir. 2013)) (brackets original). These "essentially ad hoc, factual inquiries" are employed "to determine whether regulatory actions are functionally equivalent to the classic taking in which government directly appropriates private property." *Id.* (internal quotations and citations omitted).

Under the *Penn Central* test, EO 20-65's regulation of restaurants does not constitute a taking. The first factor—the economic impact on the claimant—requires "comparing the total value of the affected property before and after the government action." *Id.* at 451. A decrease in income produced by the property is relevant, but "the severity of the loss can be determined only by comparing the post-deprivation value to pre-deprivation value" of the property as a whole. *Id.* Prior cases have held a "diminution in property value because of governmental regulation ranging from 75% to 92.5% does not constitute a taking." *Id.* A temporary limitation on one use of a commercial property—for dine-in service—will fall far below that level.

The second factor—disruption of distinct investment-backed expectations—also militates against finding a taking. There is no reasonable, investment-backed expectation that the State would abdicate its traditional role to act decisively to protect public health. The Governor's emergency authorities to protect the public are longstanding, and throughout the pandemic she has used those authorities as needed based on the current understanding of the disease and its prevalence in Oregon. Even though the pandemic surely disrupted restaurants' expectations of their 2020 sales, the government's response did not.

Applying the third factor—the character of the government action—"[a] 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." *Penn Central Transp. Co.*

Page 17 - DEFENDANT'S RESPONSE TO MOTION FOR TEMPORARY RESTRAINING ORDER

*v. City of New York*, 438 U.S. 104, 124 (1978).  Here, EO 20-65 is a public policy to limit the spread of a deadly disease.  Expanding the Takings Clause to encompass emergency actions to combat communicable diseases would "limit the state's especially broad police power in responding to a health emergency. Constraining such government actions would exceed the scope of the Takings Clause by 'transform[ing] [the] principle [that "all property in this country is held under the implied obligation that the owner's use of it shall not be injurious to the community"] to one that requires compensation whenever the state asserts its power to enforce it.'"  *TJM 64, Inc. v. Harris*, No. 220CV02498JPMTMP, 2020 WL 4352756, at *7 (W.D. Tenn. July 29, 2020) (modifications original) (denying temporary restraining order, holding claim that prohibiting dine-in service was unlikely to succeed) (quoting *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 492 (1987)).  Given that EO 20-65 is crucial for public health, time-limited, and permits take-out service to continue, it's doubtful any restaurant would ever succeed in showing that EO 20-65 "goes too far" and so must "be recognized as a taking." *Penn. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922).

ORLA's takings claim is also unlikely to succeed given that it presents a facial challenge to EO 20-65.  "A facial challenge is an attack on a law itself as opposed to a particular application. Such challenges are considered the most difficult to mount successfully. A facial challenge is a claim that a law or policy is unconstitutional *in all of its applications*." *Willis v. City of Seattle*, 943 F.3d 882, 886 (9th Cir. 2019) (internal citations and quotation marks omitted) (emphasis added).  Thus, to reject ORLA's facial challenge, this Court need only conclude that ORLA is unlikely to establish that its members will *always* succeed in establishing a takings claim.  The *Penn Central* test for regulatory takings is a fact-intensive, multi-factor inquiry that cannot be applied in a facial challenge seeking a ruling regarding thousands of different restaurants.  Because the facts of "the extent [of] interfere[nce] … with distinct investment-backed expectations" and its "economic impact" will not be the same for every restaurant, ORLA cannot show EO 20-65 constitutes a taking "in all of its applications."

Page 18 -  DEFENDANT'S RESPONSE TO MOTION FOR TEMPORARY RESTRAINING ORDER

ORLA's claim under the Takings Clause does not present a serious question on the merits and provides no basis to issue a preliminary injunction.

      **b.**    **ORS 433.441 is unenforceable in federal court, provides no claim against the Governor, provides no equitable remedy, and does not apply to EO 20-65's restrictions on restaurants.**

ORLA's state law takings claim under ORS 433.441 fails procedurally and on its merits. There are three insurmountable procedural barriers to the claim. First, suing the State for damages under state law in federal court is barred by the Eleventh Amendment. *See generally Easton v. Shulkin*, No. 6:18-CV-00233-AA, 2018 WL 4901161, at *4 (D. Or. Oct. 9, 2018), *reconsideration denied*, 2018 WL 6651528 (Dec. 18, 2018), *aff'd*, 816 F. App'x 178 (9th Cir. 2020) (summarizing cases holding "[a] state's consent to suit in federal court must be unequivocally expressed in the text of a statute" and holding Oregon Tort Claims Act does not waive sovereign immunity in federal courts); *see also* Section I.A.2, above. Second, ORS 433.441 provides for "reasonable compensation from the State," not the Governor, who is the only defendant named in this action. Third, ORS 433.441, like the Fifth Amendment, refers to "compensation;" that monetary remedy precludes injunctive relief. *See* Sections IV.A.4.a, above, and IV.B, below.

ORLA's state law takings claim would also fail on its merits. ORS 433.441(6) provides for "reasonable compensation" "[w]hen real or personal property is *taken*" (emphasis added). This provision presumably incorporates Oregon law's takings jurisprudence under the Oregon Constitution. Under Oregon's test for regulatory takings, "[t]he property owner must show that the application of the government's particular choice deprives the owner of *all economically viable use of the property*." *Boise Cascade Corp. v. Bd. of Forestry*, 325 Or. 185, 198 (1997) (emphasis in original) (citations omitted). "If the owner has 'some substantial beneficial use' of the property remaining, then the owner fails to meet the test[.]" *Id.*; *see also Oregon Constitution Law* § 15.7-2(c) (2013 ed.) ("There are no reported cases in which plaintiffs have successfully demonstrated that a regulation has denied them all economically viable use under Article I,

section 18."). Thus, an ORS 433.441(6) claim would fail for the same reason a federal takings claim fails: EO 20-65's regulations are temporary and take-out service remains an economically productive use of a restaurant.

**B.    ORLA cannot demonstrate irreparable harm.**

ORLA's evidence cannot show that it will suffer irreparable harm without a temporary restraining order. First, ORLA's reports of lost sales versus past years cannot distinguish between sales lost due to state action versus those sales that would be lost regardless of EO 20-65 because of consumers' changed behavior in response to COVID-19. For example, before the two-week freeze went into effect, the Old Spaghetti Factory already suffered more than a 30 percent drop in year-over-year sales.[35] Even if the State did nothing at all, this would not be a normal Thanksgiving: many Oregonians would avoid dining in restaurants or drinking in bars to protect their own health. Nor can ORLA tie its fear "that businesses will close," Pls.' Mot. at 14, to this two-week freeze.

Second, ORLA's claimed injury is pecuniary. If ORLA's members had claims under the federal Takings Clause or ORS 433.441, as they argue, that would be an adequate remedy at law. Under the Takings Clause and ORS 433.441, Oregon is permitted to take private property so long as it is for a public purpose; it only has to provide just compensation. For that reason, "[e]quitable relief is not available to enjoin an alleged taking of private property for public use, duly authorized by law, when a suit for compensation can be brought against the sovereign subsequent to the taking." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 997, 1016 (1984); *accord Knick*, 139 S. Ct. at 2167–68 ("So long as the property owner has some way to obtain compensation after the fact, governments need not fear that courts will enjoin their activities … ."). Such a damages remedy for a Takings Clause violation is available against the State. *See Boise Cascade Corp. v. State ex rel. Oregon State Bd. of Forestry*, 164 Or. App. 114, 124 (1999) ("[A] state may be sued in state court for takings in violation of the federal constitution").

---

[35] *See* Griffith Decl. (ECF 7) ¶ 5 (reporting weeks ending November 8 and November 15, 2020).

Page 20 - DEFENDANT'S RESPONSE TO MOTION FOR TEMPORARY RESTRAINING ORDER

In addition, federal and state financial assistance, while not fully alleviating the financial losses on businesses, should ameliorate the hardship on ORLA's members to some extent.[36]

## C.    The balance of equities favors the State.

The Court here is called to balance ORLA's interest in restaurants being able to continue serving maskless patrons food and drinks on-site during a time when infections are skyrocketing across the state, as against the public interest in slowing the spread of COVID-19 so that as few people sicken and die as possible.  ORLA's constitutional rights do not include the "liberty to expose the community * * * to a communicable disease." *Prince v. Massachusetts*, 321 U.S.158, 166–67 (1944).

The Governor too is called to balance those interests. As Justice Garrett wrote in his concurrence in *Elkhorn Baptist Church*, 366 Or. at 546, the Governor is duty-bound to determine where the public interest lies, and to issue actions in accordance with her determination of those interests:

> The Governor is defending not her personal interests, but her considered understanding of the public interest. Her executive orders, as plaintiffs acknowledge, are directed at protecting the public. As the Governor of Oregon, she is uniquely situated, and dutybound, to protect the public in emergency situations and to determine, in such emergencies, where the public interest lies. The challenged orders were issued in performance of those duties, based on consideration of the range of dangers that different Oregonians may face from COVID-19, the scientific evidence that is available to her regarding how best to contain the disease, and the strong interests of Oregonians in maintaining their religious practices and businesses but also in protecting themselves and their loved ones.

Oregon reported 812 deaths as of November 20,[37] and those losses will be felt for years to come.  The number of "long-haul" patients experiencing severe symptoms for months at a

---

[36] *ORLA's Statement on $55 million relief fund announced by the Governor* (Nov. 18, 2020), https://www.oregonrla.org/blog/orla-ceo-update-for-oregons-hospitality-industry#statement ("The Oregon Restaurant & Lodging Association appreciates the intentional efforts taken by the Governor's Office to prop up additional funding for Oregon's small businesses with an emphasis on the hospitality industry. The $55 million relief fund represents a bridge for much needed federal action.").

[37] Sidelinger Decl. ¶ 7.

Page 21 -  DEFENDANT'S RESPONSE TO MOTION FOR TEMPORARY RESTRAINING ORDER

stretch is unknown in Oregon.  Now, as reported infections are skyrocketing in Oregon and across the country, and as our health systems warn of the potential for hospitals and their staff to become overloaded as hospitalizations follow the rise in new cases.  Overloaded hospitals do not only impact those who contract COVID-19.  Victims of heart attacks, strokes, or other health emergencies may not have the beds or medical staff available to get the care they need.  Significantly slowing the exponential rise in cases now is critical to avoid a catastrophic surge in hospitalizations (which, as always with this disease, trails new cases by several weeks).  Faced with these significant threats to human life and human health, the Governor is putting a set of temporary restraints on a range of activities and businesses in an effort to protect the lives and health of Oregonians.

Even if the Court were to find some impact on the constitutional rights of ORLA and its members—and, as addressed above, their constitutional rights are not in fact impaired here—that impact would be limited by the temporary nature of the short-term limits mandated by Executive Order 20-65.  Restaurants will be able to put their investments in safer dining to use; just not for the limited duration of this pause.  This pandemic, and the limitations needed to keep it from growing unrestricted in Oregon, has caused undeniable pain to Oregon's businesses and workers.  But the burdens resulting from this temporary pause in on-site dining are outweighed by the benefits to all Oregonians from restrictions designed to keep as many people alive and healthy as is possible during this pandemic.

Allowing restaurants to continue serving multiple groups of people in the midst of the worst outbreak would pose a public health risk and create an unreasonable risk of exacerbating the already-spiking spread of COVID-19 throughout the State, infecting and potentially killing many Oregonians.  With the health and lives of Oregonians in the balance, it is hard to imagine a situation in which the public interest against injunctive relief would be more profound.  *See Harvest Rock Church, Inc. v. Newsom*, No. 20-55907, 2020 WL 5835219, at *2 (9th Cir. Oct. 1,

Page 22 -  DEFENDANT'S RESPONSE TO MOTION FOR TEMPORARY RESTRAINING ORDER

2020) (concluding that it would not be in the public interest to enjoin Governor's executive orders restricting worship services).

The risks posed by in-person dining in restaurants are real, and, in light of the current spiraling COVID-19 infections in this state, they are substantial. The losses that would result from the injunction plaintiffs seek are measured in Oregonians' lives. There is no single right answer here. This Court should allow the Governor to perform her role in balancing the diverse interests, rather than substituting its own judgment, during the most dangerous phase of the pandemic that we have yet experienced in Oregon.

## V. CONCLUSION

The motion for a temporary restraining order should be denied.

DATED November __23__, 2020.

Respectfully submitted,

ELLEN F. ROSENBLUM
Attorney General


_____*s/ Sheila H. Potter*_____
SHEILA H. POTTER #993485
BRIAN SIMMONDS MARSHALL #196129
Senior Assistant Attorneys General
Trial Attorneys
Tel (971) 673-1880
Fax (971) 673-5000
Brian.S.Marshall@doj.state.or.us
Sheila.Potter@doj.state.or.us
Attorneys for Defendant Governor Kate Brown

Page 23 -  DEFENDANT'S RESPONSE TO MOTION FOR TEMPORARY RESTRAINING ORDER