IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **OREGON RESTAURANT AND LODGING ASSOCIATION,** an Oregon Domestic Non-Profit Corporation, and **RESTAURANT LAW CENTER**,<br><br>        Plaintiffs,<br><br>      v.<br><br>**KATHERINE "KATE" BROWN,** in her official capacity as the Governor of the State of Oregon,<br><br>        Defendant. | Case No. 3:20-cv-02017-YY<br><br>**OPINION AND ORDER** |

Christopher K. Dolan, Edward H. Trompke, Joseph A. Rohner, Jordan Ramis PC, Two Centerpointe Drive, 6th Floor, Lake Oswego, OR 97035; Angelo Amador, Restaurant Law Center, 2055 L Street, NW, Suite 700, Washington, DC 20036. Attorneys for Plaintiffs.

Sheila H. Potter, Brian Simmonds Marshall, Abigail Fallon, Oregon Department of Justice, Trial Division, 100 SW Market Street, Portland, OR 97201. Attorneys for Defendant.

**IMMERGUT, District Judge.**

      Before this Court is Plaintiffs' Motion for Temporary Restraining Order ("TRO"), ECF 4, pursuant to Rule 65 of the Federal Rules of Civil Procedure. Plaintiffs are Oregon Restaurant and Lodging Association ("ORLA"), a trade association which represents hundreds of Oregon food

service, beverage and lodging establishments, and Restaurant Law Center, a public policy organization which works on behalf of the largest national food service trade association in the United States. They seek an injunction blocking the enforcement of Executive Order 20-65 ("EO 20-65"), which was first announced by Defendant Governor Kate Brown on November 13, 2020.

On November 24, 2020, this Court held oral argument. After considering the pleadings, declarations, exhibits, and arguments of counsel, this Court finds Plaintiffs have failed to show sufficient facts and adequate legal support to warrant an order enjoining the enforcement of EO 20-65. For the reasons that follow, Plaintiffs' Motion for Temporary Restraining Order, ECF 4, is DENIED.

## BACKGROUND

This case arises from the State of Oregon's efforts to curb the spread of COVID-19. COVID-19 is an infectious disease which has killed over a quarter-million people in the United States to date, more than 800 of them in the State of Oregon. Sidelinger Decl., ECF 18 at ¶ 7.

COVID-19 spreads primarily through human-to-human contact. *Id*. at ¶ 4. The likelihood of transmission from an infected individual to a healthy individual depends on variables such as the length of exposure, space between the individuals, use or non-use of masks, and air flow in the environment (e.g., indoors versus outdoors). *Id*. at ¶ 11. Although infected individuals with symptoms are understood to be most likely to spread COVID-19, asymptomatic and pre-symptomatic infected individuals can also transmit the virus. *Id*. at ¶ 6.

Like much of the country, Oregon has seen a rapid escalation in the spread of COVID-19 in recent weeks. ECF 1-1 at 2. The state has "gone from seeing around 200-300 cases a day in September, to over 1,000 cases a day in mid-November." *Id*. Last week, Oregon set a record for the number of new COVID-19 cases four days in a row, with 1,517 new cases confirmed on

November 22, 2020.[1] The effective reproduction number for COVID-19 in Oregon is estimated to be approximately 1.47, meaning that every 100 individuals infected with COVID-19 in turn infect approximately 147 others. Sidelinger Decl., ECF 18 at ¶ 10

In response to the spiking infection rates, Governor Brown issued EO 20-65, which imposes a two week "temporary freeze" across the State of Oregon from November 18, 2020, through December 2, 2020. ECF 1-1 at 1–2. The order closes gyms, pools and other sports facilities, museums and other indoor recreational activities, event venues, and zoos and other outdoor entertainment activities. *Id*. at 4–5. It also prohibits work in offices whenever telework and work-at-home options are available and limits in-home and other social gatherings to a maximum of six people from not more than two households. *Id*. at 3, 6.

Most relevant to the instant case, EO 20-65 prohibits "restaurants, bars, taverns, brew pubs, wine bars, wineries, cafes, food courts, coffee shops, clubs, or other similar establishments that offer food or drink" (collectively, "restaurants") from offering or allowing "on-premises consumption of food or drink, inside or outside" during the freeze period. *Id*. at 4. Restaurants may continue to offer take-out, drive-through, and delivery options. *Id*. The prohibition of on-premises consumption of food or drink "does not apply to health care facilities, child care facilities, workplaces, government buildings, emergency response activities, school-based food programs, encampments of people experiencing homelessness, and shelter and meal programs serving vulnerable populations." *Id*.

---

[1] https://www.oregon.gov/oha/ERD/Pages/Oregon-reports-1517-new-confirmed-and-presumptive-COVID-19-cases-1-new-death.aspx (last accessed Nov. 24, 2020).

EO 20-65 permits certain sectors of Oregon's economy to continue to operate during the freeze period if they "comply with applicable sector-specific OHA guidance." *Id*. at 5. The order provides that the activities and businesses that fit into this category include but are not limited to:

> (1) Grocery stores and pharmacies may continue to operate, but are limited to 75% capacity;
>
> (2) Retail, farmer's markets, indoor and outdoor malls, and state agency operations that serve the public may continue to operate, but are limited to 75% capacity;
>
> (3) Personal services, as defined in OHA guidance;
>
> (4) Outdoor recreation and outdoor sports, including Division 1 college sports;
>
> (5) Drive-ins;
>
> (6) Transit, youth programs, self-service operations, and such other sectors for which OHA issues freeze period guidance.

*Id*. EO 20-65 provides an enforcement mechanism, which includes civil penalties up to a maximum fine of $500 per day per violation. *Id*. at 9. Any person knowingly violating the order "shall, upon conviction thereof, be guilty of a Class C misdemeanor, which is punishable by 30 days in jail or a fine of $1,250 or both." *Id*.

The preamble to EO 20-65 cites limited hospital capacity as one of the reasons that urgent action is required under these circumstances:

> [O]ur hospitals have been sounding the alarm. Hospital census due to COVID patients needing hospitalization is growing rapidly across most of the state. Hospitals have started to utilize tools to maximize patient access to hospital beds, but the tools are not infinite. In recent days, several hospitals across the state have voluntarily begun to reduce some surgeries to preserve beds and staff capacity. This is not just happening in Oregon. The dreaded winter surge is here. Infection records are being set in states across the country. This means we cannot look to other states to share their staffing and hospital beds because they too are experiencing the surge.
>
> The cycle of this virus is such that if we are seeing case rates topping 800-1,000 per day now, that means our hospitals are headed for very dark days ahead. Actions taken now will help prevent lives from being lost—not just from COVID-19, but from other diseases or accidents that lead people to need hospital-level care, which

>they would not be able to get if hospital beds and hospital staff are fully occupied with COVID-19 patients.

*Id*. at 2.

Plaintiffs in this case represent certain "food and drink establishments" in Oregon. ECF 1 at ¶ 16. They have submitted declarations to this Court detailing the hardships their businesses have suffered since the COVID-19 pandemic began earlier this year. *See* West Decl., ECF 5; Brandt Decl.; ECF 6; Griffith Decl., ECF 7; Rosendahl Decl., ECF 8. Plaintiffs argue that EO 20-65 "completely removes any possibility of conducting a substantial portion of any typical bar or restaurant operation, namely the ability of such establishments to permit their patrons to enjoy food or drink on site, whether in indoor seating or in outdoor seating." *Id*. They further claim that EO 20-65 "expressly discriminates against those in the restaurant and hospitality businesses by permitting other similarly situated business, i.e. '[c]ertain specified sectors of Oregon's economy' to operate with only limited restrictions, or in some cases no restrictions whatsoever." *Id*. at ¶ 20. They maintain that they "should be able to continue business operations within the appropriate public health guidelines offered by the CDC and OHA, as applicable, without the restrictions imposed by EO 20-65." *Id*. at ¶ 24.

## LEGAL STANDARDS

In deciding whether to grant a motion for a temporary restraining order, courts look to substantially the same factors that apply to a court's decision on whether to issue a preliminary injunction. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co*., 240 F.3d 832, 839 n.7 (9th Cir. 2001). A plaintiff seeking a preliminary injunction generally must show that: (1) he or she is likely to succeed on the merits; (2) he or she is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his or her favor; and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008). "When the

government is a party, these last two factors"—the balance of equities and the public interest—"merge." *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

The Ninth Circuit applies a "sliding scale" approach in considering the factors outlined in *Winter*. A stronger showing of one element of the preliminary injunction test may offset a weaker showing of another. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–32 (9th Cir. 2011). Thus, "when the balance of hardships tips sharply in the plaintiff's favor, the plaintiff need demonstrate only 'serious questions going to the merits.'" *hiQ Labs, Inc. v. LinkedIn Corp.*, 938 F.3d 985, 992 (9th Cir. 2019) (quoting *All. for the Wild Rockies*, 632 F.3d at 1135). Nevertheless, the plaintiff bears the burden of "demonstrat[ing] that it meets all four" of the *Winter* factors in order to obtain a preliminary injunction. *DISH Network Corp. v. F.C.C.*, 653 F.3d 771, 776-77 (9th Cir. 2011).

## DISCUSSION

The Court evaluates each TRO factor in turn.

**A. Likelihood of Success on the Merits.**

    **1. Equal Protection and Substantive Due Process[2]**

Both parties agree that rational basis review is the governing standard here. *See* ECF 4 at 7-9; ECF 17 at 9. Under that standard, this Court evaluates "whether the legislation bears a rational relationship to a legitimate state interest." *Jackson Water Works, Inc. v. Pub. Utilities Comm'n of State of Cal.*, 793 F.2d 1090, 1094 (9th Cir. 1986).

---

[2] In their Motion, Plaintiffs "do not analyze their due process claims separately from those based on equal protection." *San Francisco Apartment Ass'n v. City & Cty. of San Francisco*, 881 F.3d 1169, 1179 n.7 (9th Cir. 2018). Accordingly, this Court focuses on the equal protection claim.

Undoubtedly, the Governor's Executive Order serves a legitimate state interest: preventing the spread of COVID-19 during a sharp increase in cases and protecting Oregonians' health and safety. ECF 4-1 at 1-2. *See Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1614 (2020) (Roberts, C.J., concurring) ("Our Constitution principally entrusts '[t]he safety and the health of the people' to the politically accountable officials of the States 'to guard and protect.'") (quoting *Jacobson v. Massachusetts*, 197 U.S. 11, 38 (1905)). To satisfy rational basis review, "[t]here need not be a tight fitting relationship between the legislative goal and the result. All that is needed to uphold the state's classification scheme is to find that there are plausible, arguable, or conceivable reasons which may have been the basis for the distinction." *Jackson Water Works*, 793 F.2d at 1094 (internal citations and quotation marks omitted). Still, "the justification for the law may not rely on factual assumptions that exceed the bounds of rational speculation." *Golinski v. U.S. Office of Pers. Mgmt.*, 824 F. Supp. 2d 968, 996 (N.D. Cal. 2012) (citing *Lewis v. Thompson*, 252 F.3d 567, 590 (2d Cir. 2001)). Here, Plaintiffs must "demonstrat[e] a 'likelihood' or 'serious question' that they would be able to refute all rationales for this distinction and its relationship to the goal." *Angelotti Chiropractic, Inc. v. Baker*, 791 F.3d 1075, 1086 (9th Cir. 2015).

Under EO 20-65, restaurants "may not offer or allow on-premises consumption of food or drink, inside or outside," while other businesses are expressly exempted from this restriction. ECF 1-1 at 4. Additionally, up to six persons of two different households are permitted to gather in homes while gatherings may not take place in restaurants. As to both classifications, this Court finds that, even assuming these groups are similarly situated, these classifications satisfy rational basis review. *See Gallinger v. Becerra*, 898 F.3d 1012, 1016 (9th Cir. 2018) (permitting assumption to proceed to rational basis review). Plaintiffs cite some sources that support its

PAGE 7 – OPINION AND ORDER

argument that "there appears to be no real data to show that Oregon restaurants and bars pose any greater risk than any other business in Oregon." ECF 4 at 8; ECF 20 at 3. In response, the Governor provides a Declaration by Dr. Dean Sidelinger, the State Health Officer and State Epidemiologist for the State of Oregon. ECF 18. Dr. Sidelinger points to multiple recent studies that suggest restaurants are an important source of the spread of COVID-19. *Id*. at ¶ 13. He notes that "[o]utdoor dining," while less risky than indoor dining, "would still be considered higher risk than other activities in outdoor settings because people do not maintain six feet of distance from others in their seated party and patrons remove their masks to eat or drink." *Id*. at ¶ 14. He states that "some structures commonly used for 'outdoor' dining in colder months, such as tents with multiple walls, restrict ventilation and raise the risk of transmission." *Id*. In short, there are plausible, arguable, and conceivable reasons why restaurants, whether providing indoor or outdoor service, are rationally distinguishable from other types of businesses and from limited home gatherings. In and outside of restaurants, people from multiple households sit in relatively close proximity to each other, unmasked, for extended periods of time, often in enclosed spaces. Larger groups present greater risks of spread than smaller ones. While Plaintiffs may disagree with Governor Brown's bases and reasoning, this Court cannot conclude that the classifications drawn between restaurants and other businesses and limited home gatherings are irrational in relation to the legitimate goal of preventing the spread of COVID-19 during this current spike. Accordingly, Plaintiffs have not shown a serious question or likelihood of success on the merits of their Equal Protection and Due Process claims.

### 2. Dormant Commerce Clause

Plaintiffs allege that EO 20-65 "impermissibly burdens in-state commerce to the benefit of commerce in neighboring states by requiring [people] to leave Oregon to be able to enjoy

indoor or outdoor dining on premises."[3] ECF 4 at 10. Plaintiffs also allege that the Order "burdens the entire food service industry supply chain within Oregon and to Oregon," which includes "interstate supply lines." *Id*. at 10-11.

"The Supreme Court has adopted a two-tiered approach to analyzing state economic regulation under the Commerce Clause." *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 948 (9th Cir. 2013) (internal citations and quotation marks omitted). At the first tier, "[i]f a statute discriminates against out-of-state entities on its face, in its purpose, or in its practical effect, it is unconstitutional unless it 'serves a legitimate local purpose, and this purpose could not be served as well by available nondiscriminatory means.'" *Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070, 1087 (9th Cir. 2013) (quoting *Maine v. Taylor*, 477 U.S. 131, 138 (1986)). At the second tier, "[i]n contrast, if the regulations apply evenhandedly to in-state and out-of-state interests, the party challenging the regulations must establish that the incidental burdens on interstate and foreign commerce are clearly excessive in relation to the putative local benefits." *Pac. Nw. Venison Producers v. Smitch*, 20 F.3d 1008, 1012 (9th Cir. 1994) (citations omitted); *see also Pike v. Bruce Church*, 397 U.S. 137 (1970).

At the first tier, this Court finds that the Executive Order does not discriminate in favor of in-state interests. Plaintiffs have not alleged a discriminatory purpose. The Order regulates without regard to geographic origin, meaning it is not discriminatory. *See, e.g., Ass'n des Eleveurs de Canards et d'Oies du Quebec*, 729 F.3d at 948; *Pac. Nw. Venison Producers*, 20

---

[3] Plaintiffs request that "the Court take judicial notice of the current status of the states that border Oregon, all of which appear to allow at least outdoor dining for restaurants at this time." ECF 4 at 10. The Court takes judicial notice of the materials on the governmental websites for the states of Washington, Idaho, and California, and for the Southern Nevada Health District, provided by Plaintiffs, which reflect plans permitting at least some outdoor dining. However, the Court does not take judicial notice that these plans "have been implemented or will be effective." *George v. Diaz*, No. 20-CV-03244-SI, 2020 WL 2542020, at *3 (N.D. Cal. May 19, 2020).

PAGE 9 – OPINION AND ORDER

F.3d at 1012; *see also Antietam Battlefield KOA v. Hogan*, 461 F. Supp. 3d 214, 239-40 (D. Md. 2020) (finding no discrimination facially, in effect, or in purpose in state COVID-19 closure order). The Order also does not impermissibly directly regulate interstate commerce. Because the regulation is "of in-state conduct," the Executive Order "passes Commerce Clause muster" even with its alleged "significant extraterritorial effects." *Chinatown Neighborhood Ass'n v. Harris*, 794 F.3d 1136, 1145 (9th Cir. 2015); *see also Rocky Mtn. Farmers Union*, 730 F.3d at 1101–04 (9th Cir. 2013) (upholding California fuel standard applying only to fuels consumed in California even though it affects activity beyond state borders).

At the second tier analysis, even assuming an incidental burden on interstate commerce, the State "has a legitimate interest in guarding against imperfectly understood environmental risks, despite the possibility that they may ultimately prove to be negligible." *Maine v. Taylor*, 477 U.S. at 148. "Particularly when the extent of the risks is in dispute, the [State] is clearly permitted to err on the side of excess in taking precautionary measures." *Pac. Nw. Venison Producers*, 20 F.3d at 1016–17. "Only if [Plaintiffs] were able to conclusively establish that [their] alternatives"—such as allowing restaurants to remain fully open, or open for outdoor seating—"would eliminate [the] risks [ ] could we overturn the [State's] decision to err on the side of safety." *Id*. at 1017; *see also Raymond Motor Transp., Inc. v. Rice*, 434 U.S. 429, 447-48 (1978) (finding state regulation unconstitutional under *Pike* where "the evidence produced on the safety issue" was "so overwhelmingly one-sided" and the state "failed to make even a colorable showing that its regulations contribute[d] to highway safety"); *Maine v. Taylor*, 477 U.S. at 151 (upholding state law). This Court cannot say that the evidence on restaurant transmission is so conclusive in favor of Plaintiffs as to render any incidental burden on interstate commerce here clearly excessive. Accordingly, this Order does not violate the dormant Commerce Clause.

### 3. Improper Delegation

Plaintiffs allege that the Oregon Legislature improperly delegated all police powers to the Governor in the event of an emergency, and therefore Governor Brown wielded power in violation of the Oregon Constitution by issuing EO 20-65 under her emergency authority. This Court, however, is barred from adjudicating this claim by Eleventh Amendment principles.

As a sovereign in our constitutional system, "an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another state." *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). A state's immunity from suits by private citizens in federal court typically extends to state officials sued in their official capacities because "the state is the real, substantial party in interest" in such situations. *Id*. at 101 (internal quotation marks and citation omitted).

*Ex parte Young*, 209 U.S. 123 (1908), provides a limited exception to this rule where prospective injunctive relief is sought "to prevent a continuing violation of federal law." *Green v. Mansour*, 474 U.S. 64, 68 (1985). However, this exception does not apply where, as here, the suit alleges a violation of state rather than federal law. *See Seldovia Native Ass'n, Inc. v. Lujan*, 904 F.2d 1335, 1349–50 (9th Cir. 1990); *see also Hale v. State of Arizona*, 967 F.2d 1356, 1369 (9th Cir. 1992), *on reh'g*, 993 F.2d 1387 (9th Cir. 1993) ("the Eleventh Amendment deprives federal courts of jurisdiction to order state actors to comply with state law").

This immunity applies equally where the relevant law is the state's constitution rather than a legislatively enacted statute. *See Vulliet v. Oregon*, No. 6:12-cv-492-AA, 2012 WL 4863710, at *6 (D. Or. Oct. 10, 2012), *aff'd*, 701 Fed. Appx. 579 (9th Cir. 2017) ("The Eleventh Amendment bars the adjudication of pendent state law claims against nonconsenting state

defendants in federal court … Thus, plaintiff's claim under the Oregon Constitution must be brought in state court and is dismissed.") (internal quotation marks and citations omitted).

Therefore, this Court is barred from adjudicating Plaintiffs' improper delegation claim.

### 4. Takings

Plaintiffs further claim that EO 20-65 constitutes a statutory taking under Oregon law and a regulatory taking under the Fifth Amendment.

As with Plaintiffs' improper delegation claim, this Court is barred from adjudicating the statutory takings claim arising under Oregon law by the Eleventh Amendment. Non-consenting states are immune from suits brought by private citizens for damages under state law in federal court. *See, e.g.*, *Easton v. Shulkin*, No. 6:18-CV-00233-AA, 2018 WL 4901161, at *4 (D. Or. Oct. 9, 2018), *reconsideration denied*, 2018 WL 6651528 (Dec. 18, 2018), *aff'd*, 816 F. App'x 178 (9th Cir. 2020).

As for the Fifth Amendment takings claim, Plaintiffs cannot establish a likelihood of success on the merits. First, even if Plaintiffs were able to establish that EO 20-65 resulted in a regulatory taking under the Fifth Amendment, the appropriate remedy would be "just compensation" in the form of damages, not the injunctive relief sought here. *See Knick v. Township of Scott, Pennsylvania*, 139 S. Ct. 2162, 2176 (2019) ("As long as an adequate provision for obtaining just compensation exists, there is no basis to enjoin the government's action effecting a taking.").

Second, Plaintiffs cannot establish that EO 20-65 is a taking under the Fifth Amendment. Regulatory takings are analyzed under the three-pronged *Penn Central* test. "*Penn Central* instructs [courts] to consider [1] the regulation's economic impact on the claimant, [2] the extent to which the regulation interferes with distinct investment-backed expectations, and [3] the

character of the government action." *Colony Cove Props., LLC v. City of Carson*, 888 F.3d 445, 450 (9th Cir. 2018) (internal quotation marks and citations omitted). These three "factual inquiries" are used "to determine whether regulatory actions are functionally equivalent to the classic taking in which government directly appropriates property." *Id*. (internal quotation marks and citations omitted).

In assessing a regulation's economic impact on a claimant, courts compare "the total value of the affected property before and after the government action." *Id*. at 451. While a decrease in income produced by a property is a relevant consideration, "the severity of the loss can be determined only by comparing the post-deprivation value to pre-deprivation value" of the property. *Id*. Ninth Circuit cases have held that "diminution in property value[s] because of governmental regulation ranging from 75% to 92.5% do[] not constitute … taking[s]." *Id*. Under this high standard, Plaintiffs have not shown that the profits they will lose as a result of the two-week ban on on-site dining will be severe enough to constitute a taking.

The second *Penn Central* factor, disruption of distinct investment-backed expectations, also weighs against finding a taking. "To form the basis for a taking claim, a purported distinct investment-backed expectation must be objectively reasonable." *Colony Cove Props, LLC*, 888 F.3d at 452. EO 20-65 was issued in an effort to protect the public against a deadly, contagious disease that has already killed hundreds of Oregon citizens in a matter of months. There is no reasonable, investment-backed expectation that the state would not act in the face of a historic public health crisis. The Governor's emergency authorities to protect the public are long-standing and have been used based on the current understanding of COVID-19 and its prevalence in Oregon.

The third factor, the character of the government action, also militates against finding a taking. "A 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978). Here, EO 20-65 is not a physical invasion of property by the government but an emergency regulation promulgated to combat a worsening pandemic. Recognizing such government action as "functionally equivalent to the classic taking in which government directly appropriates property" would exceed the scope of the Takings Clause and interfere with the state's ability to protect the public health. *See Colony Cove Props, LLC*, 888 F.3d at 450.

**B. Irreparable Harm**

Plaintiffs must also "demonstrate that irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22, 129 S.Ct. 365. To satisfy this factor, Plaintiffs must show a "real or immediate threat that [Plaintiffs] will be wronged again." *Lyons*, 461 U.S. at 111, 103 S.Ct. 1660.

Plaintiffs argue that, given the substantial harm already suffered by Oregon restaurants due to the COVID-19 pandemic, a two-week ban on on-site dining will create irreparable harm to many of these businesses. This Court acknowledges the significant hardship that businesses like those represented by Plaintiffs have endured in the wake of COVID-19. This Court further recognizes that these restrictions cause significant hardships for employees who work for Plaintiffs' restaurants. Restaurants and other businesses that rely on in-person customers have been especially hard-hit by the pandemic, and this Court does not seek to diminish the challenges they continue to face. However, the unlikelihood of Plaintiffs' success on the merits and the

balance of the equities discussed below weigh heavily against an injunction. The weight of these factors cannot be offset by the evidence of possible harm put forth by Plaintiffs here.

**C. The Balance of Equities and Public Interest**

A plaintiff seeking a preliminary injunction or temporary restraining order must also establish not only that he is likely to succeed on the merits and is likely to suffer irreparable harm in the absence of preliminary relief, but also that the balance of equities tips in his favor, and that an injunction is in the public interest. *Winter*, 555 U.S. at 20. "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.* at 24 (internal citations omitted).

Here, the balance of the equities weighs heavily in favor of the State. The government is facing a historic public health crisis that continues to rapidly evolve. Over 800 people in Oregon have died and over a thousand new cases are being reported per day. Hospitals have begun preparing for an anticipated capacity crisis. An overloaded hospital system would impact not only those who need treatment for COVID-19, but also those who suffer other forms of medical emergencies and need immediate care. Given this dangerous situation and the information discussed above about how COVID-19 is transmitted, Governor Brown decided that a temporary prohibition on on-site dining was necessary to mitigate the spiking infection rate.

Further weighing in the government's favor is the fact that the order is of limited duration and allows Plaintiff restaurants to continue to offer take-out, drive-through, and delivery options. This Court recognizes the heavy burdens placed on Plaintiffs by the pandemic and EO 20-65, but those burdens are outweighed by the benefits to all Oregonians from restrictions designed to keep as many people alive and healthy as possible during this historic pandemic.

## CONCLUSION

For the reasons stated above, Plaintiffs' Motion for a Temporary Restraining Order, ECF 4, is DENIED.

**IT IS SO ORDERED**.

DATED this 24th day of November, 2020.

/s/ Karin J. Immergut
Karin J. Immergut
United States District Judge
